# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

FILED
U.S. DISTRICT COURT
SIOUX CITY
NORTHERN DISTRICT OF IOWA

MAR 1 4 2005

By:_____
DEPUTY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR 01-3047 MWB |
| | ) | |
| DUSTIN LEE HONKEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 29(c) AND 33
### (FILED UNDER SEAL)

## TABLE OF CONTENTS

I. Summary of the Argument....................................................................3
II. Juror Misconduct...........................................................................4
    A.   Introduction................................................................4
        1.   Pre-trial Jury Preparation................................................4
        2.   Voir Dire of Panel L.....................................................5
        3.   General Voir Dire........................................................5
        4.   Merits Phase and Penalty Phase of Trial................................6
        5.   Government's Position...................................................10
        6.   Defendant's Position....................................................11
    B.   Violation of Defendant's Sixth Amendment Right to Impartial Jury.....11
        1.   Presumption of Prejudice................................................11
        2.   Concealed Juror Bias....................................................19
    C.   Credibility of Witness Testimony...........................................21
        1.   Juror 523................................................................24
        2.   CEO, Alden Bailey.......................................................24
    D.   Obligation to Report Communications to the Court.......................27
    E.   Interests of Justice Require Granting Motion for New Trial.............31

1

III. Errors in Pretrial Rulings............................................................33
    A.    Former Jeopardy ..................................................................33
        1.    The conspiracy In Case No. CR 96-3004 MWB is the same as the conspiracy alleged in Counts 8 through 12................................34
        2.    The conspiracy to manufacture and distribute methamphetamine is an essential element of each of the murders charged in Counts 8 through 12................................................................................36
        3.    The drug conspiracy charged in Case No. CR 96-3004 MWB is a lesser included offense of the continuing criminal enterprise charged in Counts 13 through17 of the instant indictment..........37
        4.    The existence of a continuing criminal enterprise is an essential element of the murders charged in Counts 13 through 17 of the instant indictment.........................................................................40
        5.    The double jeopardy clause precludes the successive prosecution of Mr. Honken for the murders charged in Counts 13 through 17 of the instant indictment....................................................................40
    B.    Failure to Disclose Grounds for Disqualification...........................43
        1.    Standards for Disclosure and Judicial Disqualification............43
        2.    The Trial Court's Duty to Disclose.................................46
    C.    Error in Ordering Defendant be Shackled.................................49
    D.    Erroneous Empanelling of Anonymous Jury.............................51
IV. Errors in Jury Selection.......................................................53
    A.    Defense Challenges Erroneously Denied...............................53
    B.    Prosecution Challenges Erroneously Granted........................54
V. Errors During Trial...............................................................55
    A.    Confrontation Clause Violations and the Erroneous Admission of Hearsay.......................................................................55
    B.    Restricting the Cross Examination of Tim Cutkomp.......................60
    C.    Overruling Motion for Mistrial when Scott Gahn Persisted in Testifying about Alleged Cocaine Use by Mr. Honken Despite the Court Having Earlier Sustained Mr. Honken's Objection to this Testimony..............61
    D.    Errors in Penalty Phase Instructions......................................61
        1.    21 U.S.C. § 848 (n)(1) Factors.....................................61
        2.    Non-statutory Aggravating Factor No. 2....................................62
VI. Insufficiency of the Evidence.................................................63
    A.    Conspiracy Murder ...........................................................63
    B.    CCE Murder...................................................................66

Case 3:01-cr-03047-LTS-KEM   Document 634   Filed 03/14/05   Page 2 of 70

# I. SUMMARY OF THE ARGUMENT

Based on Federal Rule of Criminal Procedure 33 and the Sixth Amendment, Honken is entitled to a new trial because of jury tampering and misconduct. Juror 523 was tampered with prior to, during, and after the guilty verdict. Many other jurors had discussed with Juror 523 the incidents of tampering, but failed to report this to the Court. The government cannot rebut the presumption of prejudice. Juror 523 failed to answer honestly material questions during *voir dire*. A correct response would have provided a valid basis to challenge her for cause. Honken is entitled to a new trial because of pretrial rulings that prejudiced his right to a fair trial. Honken had already plead guilty and was serving a prison sentence for the same drug conspiracy that was a lesser included offense of Counts 8 through 12 and 13 through 17 of the Superceding Indictment. This violated the Double Jeopardy Clause of the Fifth Amendment. The Court failed to disclose grounds for disqualification, specifically extreme security measures implemented to protect the Court and his family.

Additional issues that warrant a new trial are: (1) Honken's Fifth, Sixth and Eight Amendment rights were violated by the erroneous granting of prosecution challenges and denials of defense challenges during jury selection; (2) several out-of-court statements were admitted in violation of the Confrontation Clause; (3) the Court restricted the cross-examination of Tim Cutkomp, which prevented Honken from

3

adequately confronting the witness against him; and, (4) the Court denied Honken's motion for mistrial after prosecution witness, Scott Gahn, deliberately testified about Honken's alleged cocaine use, which placed unfairly prejudicial evidence of uncharged conduct before the jury.

Honken ends his motion for new trial with his challenge to the sufficiency of the evidence to support the verdicts. The government failed to establish that Honken participated in a single, ongoing conspiracy at the time the murders were committed. The government also failed to establish that Honken was engaged in a Continuing Criminal Enterprise (CCE). The government failed to establish that Honken supervised, organized, or managed five other individuals while engaged in the CCE at the time of the murders.

## II. JUROR MISCONDUCT

### A. Introduction

#### 1. Pre-trial Jury Preparation

Before trial started on August 17, 2005, lengthy juror questionnaires were mailed to one thousand (1,000) potential jurors. After the initial screening, remaining potential jurors were randomly selected to panels of approximately fifteen and assigned a day for voir dire. Juror 523's answers to her questionnaire provided no indication that she would not be qualified to sit as a juror in Mr. Honken's case.

4

## 2. Voir Dire of Panel L

Juror 523 was in Jury Panel L and appeared in court September 1, 2004. During general voir dire, Judge Bennett questioned the panel about potential hardships associated with serving as a juror. When questioned about a severe hardship, potential Juror 523 responded, "I don't believe I do...." (Sept 1 Tr 35). When questioned individually, potential Juror 523 did not volunteer any information about potential hardships regarding her employment. Juror 523 was specifically asked if she had heard anything about this case. (Individual Questioning of Prospective Juror 523 Tr 4). Juror 523 denied any knowledge. C.J. Williams asked Juror 523, "So you come at it with a clean slate?" Juror 523 responded, "Yep." (Individual Questioning of Prospective Juror 523 Tr 5). Juror 523 did not mention her boss' comments concerning her potential jury service or his desired outcome of the case. (Individual Questioning of Prospective Juror 523 Tr 3-15).

## 3. General Voir Dire

After voir dire of the panels, 75 jurors returned on September 8, 2004, for general voir dire. Juror 523 was asked the following during Voir Dire:

> 1. Since we talked with you individually, have any of you experienced any changes in your health, employment, or family situation that may substantially affect your ability or willingness to serve as a juror in this case?

5

2. Since we talked with you individually, have any of you been approached by or conversed with anyone concerning your potential service as a juror in this case?

3. Since we talked with you individually, have any of you heard someone else express an opinion concerning the guilt or innocence of the defendant or the appropriate punishment of the defendant in the event of a guilty verdict?

Juror 523 remained silent. Juror 523 made no mention of her boss' comments regarding her service as a juror on Mr. Honken's case despite her later testimony that, "yeah. He said the "guilty, guilty, guilty" before I even started my service," and that her boss told her that she should have "stood up in court and said hang him." ((Proceedings re: Juror 523 Tr 7-8)). Juror 523 was selected for jury service.[1]

### 2. Merits Phase and Penalty Phase of Trial

After the merits phase verdict, but before jurors had fully deliberated punishment, it was brought to the attention of the Judge by Deputy Clerk Suzanne Carlson and the Judge's secretary, Jennifer Gill, that Juror 523 had perhaps engaged in some form of jury misconduct. Ms. Gill stated that after jurors had voted not to deliberate on Friday, October 22, 2004, Juror 523 asked Deputy Clerk Suzanne Carlson for an excuse from work. (Oct. 21 Uncertified Tr 1). Juror 523 had told Ms. Carlson that her boss made comments to her about the trial. The Court brought Ms.

---

1 Some jurors responded to the questions asked by the Court. A potential juror indicated she thought about it and thought the defendant was guilty because of her interaction with her own child. Other prospective jurors were excused due to responses they made during the general voir dire.

Carlson to the courtroom and she offered a statement about Juror 523's comments.
Ms. Carlson stated:

> One of the jurors said that she didn't feel comfortable going back to work
> because her boss was making inappropriate comments to her and
> wondered if she could have an excuse for the rest of the day today and
> tomorrow because she didn't want to return to work.
>
> I then said I would check on it, and then she went on further to say that
> her boss would walk by her desk and say killer, killer, killer, kind of
> whisper, and then he would also walk by and say fry him, fry him, fry
> him, and he wouldn't say it directly to her, but her would walk by and
> whisper that in passing.

(Oct 21 Uncertified Tr 3-4). After Ms. Carlson notified the juror that she would have

to bring this to the Court's attention,

> [Juror 523] then told me that she did not want this to be broadcast in the
> papers. She was adamant about it not being made a big issue out of. She
> just wanted an excuse for work. She didn't want anyone to know who
> she was and that she had these things going on at work. She began to get
> teary-eyed, and she wanted - - she said, can you come through for me on
> this one?

(Oct 21 Uncertified Tr 4)(emphasis added). Juror 523 verified that Ms. Carlson's

account was accurate except for Carlson's report of one word. (Dec. 16 Tr 54, 56).

Carlson reported Juror 523 told her "killer, killer, killer," while Juror 523 insists that

she actually told Ms. Carlson, "guilty, guilty, guilty." (Dec. 16 Tr 56). Juror 523 had

testified previously that her boss would, "walk by my desk and say things like "guilty,

guilty, guilty," and "when are you gonna burn him" and other comments that I would

7

just like not to have to listen to." (Proceedings re: Juror 523 Tr 5) (emphasis added). Based upon her lack of memory, it is highly probable that "killer, killer, killer" was one of the "other comments" that she could not remember during her December 16, 2004, testimony.

After Ms. Carlson told the Court what happened, Juror 523 testified. Juror 523 clearly stated the chief executive officer (Alden "Corky" Bailey) started making comments to her before she was selected as a juror on September 7, 2005, and continued to make the comments throughout the trial and penalty phase. (Proceedings re: Juror 523 Tr 5-9; Dec. 16 Tr 54-55). Juror 523 stated that her coworkers gave her suggestions on how to get out of jury duty: "they all come by and give you goofy answers, you can say this to get out of it or whatever." (Dec. 16 Tr 64). Juror 523, revealing the persistence of her supervisors' attitudes toward her jury service, stated, "all along I think they've been trying to tell me to get out of it. You know, they wanted me out of the jury service, so indirectly he made comments to that effect, but I wasn't going to let that stop me." (Proceedings re: Juror 523 Tr 7-8 ).

Juror 523 mentioned several times her desire to get the case over quickly. On October 22, 2004, Juror 523 stated, "it's hard for me to go back to work....So my concern was I want to get this done. I want to get my life back." (Oct. 22 Tr 3). Juror 204 confirmed this when she was asked about her knowledge about the comments

made to Juror 523 and stated, "I think I heard her say once that her boss – she always wanted to hurry up and get the case done, so she said that her boss would make – excuse me, would make comments to her." (Oct. 25 Tr 4).

Juror 523 stated that after she was asked to come back in the larger panel of 75 potential jurors on September 1, 2005, her boss advised her that she should have, "stood up in court and said hang him." (Proceedings re: Juror 523 Tr 8-9). Juror 523's boss was questioned regarding this but had difficulty remembering exactly what he said to Juror 523. Alden Bailey stated:

> In – after Juror 523 had come back one day – and frankly, I don't know which day it was – and groused a little bit about being picked for jury panel, in a humorous context – and I don't remember the exact words – I said, You should have stood up and said something outrageous and again in a humorous context, That would have been – thrown you off the jury, but that was it.

(Dec. 16 Tr 20; See also Dec. 16 Tr 32). According to Juror 523, Bailey also asked her when she was going to burn Defendant, "when [she] was going to fry him," and, "how long is it going to take." (Proceedings re: Juror 523 Tr 5, 10). Nearly two months later, at the December 16, 2004 hearing, Juror 523 insisted that there were only two comments made:

> Juror 523:    There was two comments made….The first one was the "guilty, guilty, guilty," and the second one was "how long is it gonna take you to fry him?"…Those are the only two comments he made.
>
> Williams:    And never made any more comments than that.

9

Juror 523: No.

(Dec. 16 Tr 62). Bailey denied making any of the comments reported by Juror 523. (Dec. 16 Tr 22). When asked if he told Juror 523 that she should have stood up and said "hang him," Mr. Bailey stated, "I don't think I would have said hang him." (Dec. 16 Tr 32-33). Bailey thought he may have said to Juror 523, "Possibly say, Well, I'm an expert I the law, enjoy law, he's guilty or something of that nature." (Dec. 16 Tr 33). Bailey did think that he had a second conversation with Juror 523. (Dec. 16 Tr 34-35). Bailey stated, "And I said on the second one I could envision I would have asked somebody in passing like "good morning; are you still on jury duty?" ... And I don't – I'm not sure I even made that – asked that question." (Dec. 16 Tr 35). Bailey denied having any other conversation with Juror 523 about jury duty. (Dec. 16 Tr 36). Bailey denied making any comments in Juror 523's presence or doing anything that would make Juror 523 believe that he was making suggestions to her. (Dec. 16 Tr 22). Bailey denied telling Juror 523, "we need to fry him." (Dec. 16 Tr 36).

### 5. Government's Position

After the situation was brought to the Court's attention, Assistant United States Attorney C.J. Williams asked to have Juror 523 removed, stating:

> My suggestion is I think this juror has been tampered with. I don't think it's a juror that should remain on the jury. I think that that juror should be struck and we should substitute in an alternate juror. My concern is at

10

this point the juror's been tampered with, the juror's feeling pressured, and the juror could vote for the death penalty because she feels that if she doesn't vote for the death penalty she's going to have heck to pay back at the office. And I just don't think under those circumstances – if she's this upset and crying about it, I think we need to strike her and substitute in an alternate juror.

(Oct 21 Uncertified Tr 5-6).

### 6. Defendant's Position

While the defense agreed with the government that this was indeed a case of jury tampering, counsel did not agree that substitution of another juror was a complete remedy to the tampering. Defense counsel, Alfredo Parrish, responded:

I think that is a suggestion, but it's not close to the problem we are facing here. The depth of the problem is much greater if it started earlier, if comments were made earlier that goes to the earlier verdict, it creates an extremely serious problem. Substituting the juror is not the answer because if it engendered in the original verdict, that's the real problem here. And I think inquiry, further inquiry, is needed. As I understand the comment from the deputy clerk which was our issue when we first came in, when did it start, it appeared it may have started on Fridays precluding – preceding the original verdict. She has a duty to disclose, and as Mr. Williams has readily admitted, it does appear to be jury tampering. It would be jury tampering that preceded the original verdict. It appears to be at least in that case....

(Oct 21 Uncertified Tr 6-7).

### B. Violation of Defendant's Sixth Amendment Right to Impartial Jury

### 1. Presumption of Prejudice

11

"Private communications, possibly prejudicial, between jurors and third persons,
… are absolutely forbidden, and invalidate the verdict, at least until their harmlessness
is made to appear." *Atwood v. Mapes,* 325 F. Supp. 2d 950, 953 (N.D. Iowa 2004)
(quoting *Mattox v. United States*, 146 U.S. 140, 150, 13 S. Ct. 50, 36 L. Ed. 917
(1892)). The Sixth Amendment guarantees a criminal defendant the right to an
impartial jury. "In essence, the right to a jury trial guarantees to the criminally accused
a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a
fair hearing violates even the minimal standards of due process." *Fullwood v. Lee*, 290
F.3d 663, 677 (4th Cir. 2002) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct.
1693, 6 L. Ed. 2d 751 (1961)). The Supreme Court acknowledges that private
communications between an outside party and a juror raises Sixth Amendment
concerns. *Id.* (citing *Parker v. Gladden*, 385 U.S. 363, 364, 87 S. Ct. 468, 17 L. Ed. 2d
420 (1966)). Because the potential for mischief is so great when a third party
establishes private, extrajudicial contact with a juror, the Supreme Court adopted the
rule that:

> In a criminal case, any private communication, contact, or tampering
> directly or indirectly, with a juror during a trial about the matter pending
> before the jury is, for obvious reasons, deemed presumptively prejudicial,
> if not made in pursuance of known rules of the court and the instructions
> and directions of the court made during the trial, with full knowledge of
> the parties. The presumption is not conclusive, but the burden rests
> heavily upon the Government to establish, after notice to and hearing of

Case 3:01-cr-03047-LTS-KEM   Document 634   Filed 03/14/05   Page 12 of 70

the defendant, that such contact with the juror was harmless to the defendant.

*Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954); *Tanner v. United States*, 483 U.S. 107, 118-19, 107 S. Ct. 2739, 97 L. Ed 2d 90 (1987) (noting the "quickness with which jury findings will be set aside when there is proof of tampering or *external* influence"); *Fullwood*, 290 F.3d at 667; *United States v. Tucker*, 137 F.3d 1016, 1030 (8th Cir. 1998); see also *United States v. Caldwell*, 83 F.3d 954, 956-57 (8th Cir. 1996) (holding that third party communications regarding the substance of the trial are presumptively prejudicial and can constitute grounds for a new trial unless the government establishes that the contact was harmless to defendant). "Because jury tampering cuts to the heart of the Sixth Amendment's promise of a fair trial, we treat jury tampering cases very differently from other cases of jury misconduct. 'Any contact with a juror during trial about the case before the juror is presumptively prejudicial....'" *United States v. Willis*, 277 F.3d 1026, 1034 (8th Cir. 2002) (citing *United States v. Behler*, 14 F.3d 1264, 1268 (8th Cir. 1994)). Once the presumption of prejudice is triggered, "a new trial is warranted unless the government can demonstrate harmlessness beyond a reasonable doubt." *United States v. Hall*, 85 F.3d 367, 372 (8th Cir. 1996); see also *United States v. Dutkel*, 192 F.3d 893, 894 (9th Cir. 1999) (holding "once tampering is established we presume prejudice and put a heavy burden on the government to rebut the presumption.") *Von Kahl v.*

13

*United States*, 242 F.3d 783, 791-792 (8th Cir. 2001) (recognizing that, once prejudice is established, the "burden rests heavily upon the Government to establish…that such contact with the juror was harmless to the defendant"). The government has the burden to show that there was no reasonable possibility that Juror 523 was "affected in [her] freedom of action as a juror." See *United States v. Remmer*, 350 U.S. 377, 381, 76 S. Ct. 425, 100 L. Ed. 435 (1956).

The comments made to Juror 523 were targeted specifically to the ultimate issue of the case, whether or not Honken was guilty of the crime charged and what the ultimate punishment should be.

> Contamination of a different kind occurs when, rather than being exposed to a fact not in evidence, a juror is subjected to psychological pressure by an outsider trying to coopt that juror's vote. In such a case, the effect on the particular juror is intense and can be harmful to litigants, even though the rest of the jury remains unaware of the impropriety and even though no evidence is admitted.

*United States v. Tucker*, 137 F.3d 1016, 1032 (8th Cir. 1998). In *Tucker*, the Eighth Circuit recognized that the presumption of prejudice applies in tampering cases. *Id.* at 1030 (citing *U.S. v. Remmer*, 347 U.S. 227, 229 (1954)). Like the "troubled" and "disturbed" juror in *Remmer,* the comments made to Juror 523 subjected her to intense emotional pressure, as evidenced by her testimony and teary-eyed comments to the court while the tampering was occurring. During individual questioning in Voir Dire, Juror 523 reported that she liked her job and stated, "It's a fun job to go to."

14

(Individual Questioning of Prospective Juror 523 Tr 5). This was confirmed by one of

Juror 523's supervisors, Chres Jensen. Mr. Jensen testified that Juror 523 takes her job

very seriously and takes pride in her punctuality and organization. (Dec. 16 Tr 21).

Her attitude about her job was obviously affected by the comments from her boss.

Juror 523 was so uncomfortable, that she no longer wanted to return to work. Juror

523 disclosed her intense pressure to Jurors 902, 636, 855, 806, 38, 963 and 498 and

Deputy Clerk Suzanne Carlson. Carlson stated:

> One of the jurors said that she didn't feel comfortable going back to work
> because her boss was making inappropriate comments to her and
> wondered if she would have an excuse for the rest of the day today and
> tomorrow because she didn't want to return to work.

(Oct 21 Uncertified Tr 3-4). After Ms. Carlson notified the juror that she would have

to notify the Court:

> [Juror 523] then told me that she did not want this to be broadcast in the
> papers. She was adamant about it not being made a big issue out of. She
> just wanted an excuse for work. She didn't want anyone to know who
> she was and that she had these things going on at work. She began to get
> teary-eyed, and she wanted - - she said, can you come through for me on
> this one?

(Oct 21 Uncertified Tr 3-4). Nearly two months later, on December 16, 2004, Juror

523 had trouble remembering her discussions with other jurors and contradicted

herself, stating that the excuse was not related to the comments:

> I don't recall that I talked to them about it. I mean, there's several of us
> that asked about maybe getting an excuse not to go to work, but – and it

15

wasn't because of his comments. It was more because, you know, I was – wanted to get it over with. I wanted to get the trial done. I wanted to put it behind me and get back to my own life, so the comments weren't causing me not to want to go to work.

(December 16 Tr 67-68). Juror 523 was obviously concerned that her disclosure would somehow jeopardize her employment. After the Court told her that it was going to issue an excuse for her from work on Friday, she asked, "but it is not going to state what I say," and "but now it's not going to say that in the note." (Proceedings re: Juror 523 Tr 5-6). The Court reassured Juror 523 that the note would not state what she had said or give any reason for the excused absence. (Proceedings re: Juror 523 Tr 5-6). Additionally, Juror 523 stated, "I don't want to get myself in trouble. I've been there 25 years. He's only been there a year and a half." (Proceedings re: Juror 523 Tr 6) (emphasis added). Juror 523's deliberate decision not to report the improper comments and decision to share comments with other jurors in violation of the Court's instructions deprived Mr. Honken of a fair trial. This contact is specifically prohibited by *Remmer*.

In *Parker v. Gladden*, a bailiff made a comment to an alternate juror, which was overheard by another juror, that "oh that wicked fellow (petitioner), he is guilty" and told an unidentified juror that "if there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it." *Parker v. Gladden*, 385 U.S. 363, 363-64, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1966). Although the majority of the jurors did not hear

16

statements made by the bailiff, the Supreme Court determined the unauthorized conduct by the bailiff, "'involves such a probability that prejudice will result that it is deemed inherently lacking in due process.'" *Id.* at 365 (quoting *Estes v. State of Texas*, 381 U.S. 532, 542-43, 85 S. Ct 1628, 14 L. Ed. 2d 543 (1965)). The Court further stated, "petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors." *Id.* at 366. See also *Mattox v. United States*, 146 U.S. 140, 150, 13 S. Ct. 50, 36 L. Ed. 917 (1892) (Supreme Court granted new trial after bailiff told juror "this is the third fellow he killed," stating, "it is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment"); *United States v. Delaney*, 732 F.2d 639, 643 (8th Cir. 1984)(holding that a verdict is as unfair if a single juror is improperly influenced as if all members of the jury were improperly influenced); *Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988) (new trial granted after owner of diner stated to jurors, "I hope they fry that son of a bitch," during punishment phase of capital case). Despite having shared the comments with the majority of the other jurors, Juror 523's prejudice alone requires granting a new trial. See *United States v. Maree*, 934 F.2d 196 (9th Cir. 1991) (new trial granted when a juror's friends advised her that defendant should be found guilty and that she had an opportunity to get somebody off the street, without any evidence that juror shared comments with other jurors).

17

In *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982),

Justice O'Connor, in her concurring opinion, recognized:

> Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it. The problem may be compounded when a charge of bias arises from juror misconduct, and not simply from attempts of third parties to influence a juror. Nevertheless, I believe that in most instances a postconviction hearing will be adequate to determine whether a juror is biased. A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case.
>
> I am concerned, however, that in certain instances a hearing may be inadequate for uncovering a juror's biases, leaving serious question whether the trial court had subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice.

*Smith v. Phillips*, 455 U.S. 209, 221-222 (1982) (O'Connor, J., concurring). No juror

should be subjected to extraneous influences, "for it is the law's objective to guard

jealously the sanctity of the jury's right to operate as freely as possible from outside

unauthorized intrusions purposefully made." *Remmer v. United States*, 350 U.S. 377,

382 (1956).

Defendant's Sixth Amendment rights have been violated by the extrinsic

communications made to Juror 523 by Alden Bailey, the chief executive officer of her

company, and by Juror 523 sharing those comments with other jurors. Juror 523 was

18

so obviously pressured by her boss's comments that she asked the jury clerk for an excuse from work the next day. (Oct 21 Uncertified Tr 3-5). Such worries may well have prevented Juror 523 from thinking about the evidence or paying attention to the Court's instructions. Moreover, the coercion by her boss could have altered her demeanor in the jury room, which may have affected the jury's collective decision-making or the overall tenor of deliberations. It was so important to Juror 523 that she not have to return to work and risk further exposure to the pressure from her boss that she was visibly emotional and pleaded to the Jury Clerk to minimize the situation. Juror 523 shared those pressures and comments with other jurors on numerous occasions throughout the trial. Comments made to Juror 523 by Bailey, her reaction to such comments, and Juror 523's decision to share the comments and her concerns with other jurors, are presumptively prejudicial and violated Defendant's Sixth Amendment rights. See *Remmer*, 347 U.S. at 229 (holding that "any private communication, contact or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial").

### 2. Concealed Juror Bias

To obtain a new trial when a juror has concealed bias since *voir dire*, the Supreme Court has held:

> …a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct

response would have provided a valid basis for challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984). Thus, the Defendant must show (1) Juror 523 answered dishonestly, not just inaccurately, (2) she was motivated by partiality; and (3) that the true facts, if known, would have supported striking her for cause. See *Tucker*, 137 F.3d at 1026 (holding that defendant must "demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause" to obtain a new trial). A defendant who makes a sufficient showing of *McDonough* type irregularities is entitled to the "court's help in getting to the bottom of the matter." *Id.*

During General Voir Dire, Juror 523 was specifically asked:

1. Since we talked with you individually, have any of you experienced any changes in your health, employment, or family situation that may substantially affect you ability or willingness to serve as a juror in this case?

2. Since we talked with you individually, have any of you been approached by or conversed with anyone concerning your potential service as a juror in this case?

3. Since we talked with you individually, have any of you heard someone else express an opinion concerning the guilt or innocence of the defendant or the appropriate punishment of the defendant in the event of a guilty verdict?

20

Juror 523 did not respond in any way to any of the posed questions. However, Juror 523 later testified that, "yeah. He said the "guilty, guilty, guilty" before I even started my service," and that after she had informed her boss she was to report to the panel of 75 jurors, he informed her that she should have "stood up in court and said hang him." (Proceedings re: Juror 523 Tr 7-8). Juror 523 testified that her boss said, "guilty, guilty, guilty before I even started my service." (Proceedings re: Juror 523 Tr 7). While these conversations occurred prior to coming to court on that day, Juror 523 failed to report them to the court. Juror 523 was told by her employer that she should attempt to get out of jury service. Specifically, Juror 523 stated,

> Well, I take that back because all along I think they've been trying to tell me to get out of it. You know, they wanted me out of the jury service, so indirectly he made comments to that effect, but I wasn't going to let that stop me.

(Proceedings re: Juror 523 Tr 7-8).

"The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial. *Tucker*, 137 F.3d at 1028 (quoting *McDonough*, 464 U.S. at 556). It is clear that Juror 523 was concerned about her job. After the Court told her that it was going to issue an excuse from work for her on the Friday in question, she asked the Court, "but it is not going to state what I say," and "but now it's not going to say that in the note?" (Proceedings re: Juror 523 Tr 5-6). Additionally, Juror 523 stated, "I don't want to get myself in

trouble. I've been there 25 years. He's only been there a year and a half."
(Proceedings re: Juror 523 Tr 6). Juror 523 clearly failed to respond honestly and
truthfully to the questions posed. Knowledge that Juror 523's boss told her to "stand
up and say 'hang him'" and "guilty, guilty, guilty" certainly would have provoked a
challenge for cause. The fairness of the trial was necessarily affected by Juror 523's
failure to respond honestly and completely to questions posed to her in voir dire.

## C.  Credibility of Witness Testimony

There is contradictory and inconsistent testimony regarding jury tampering and
misconduct. The Court's credibility determinations will be important in the resolution
of these issues. "The district court ... is best able to assess the value of testimony in
light of corroborating and conflicting evidence, witness demeanor, and numerous other
factors; its findings regarding witness credibility are thus given great deference and are
"'virtually unreviewable on appeal.'"" *United States v. Johnson*, 169 F.3d 1092, 1098
(8th Cir. 1999) (quoting *United States v. Adipietro*, 983 F.2d 1468, 1472 (8th Cir.
1993)). "While the appellate court might intervene when the findings of fact are
wholly unsupported by evidence, it should never do so where it does not clearly appear
that the findings are not supported by any evidence." *United States v. Johnson*, 327
U.S. 106, 111-112, 66 S. Ct. 464, 466, 90 L. Ed. 562 (1946). This Court recognized
factors related to the assessment of a witness' credibility:

22

(1) the interest of the witness in the result of the hearing; (2) the witness's relation to any party in interest; (3) the witness's demeanor upon the witness stand; (4) the witness's manner of testifying; (5) the witness's tendency to speak truthfully or falsely, including the probability or improbability of the testimony given his or her situation to see and observe; (6) the witness's apparent capacity and willingness to tell truthfully and accurately what he or she saw and observed; and (7) whether the witness's testimony is supported or contradicted by other evidence in the case.

*United States v. Earles*, 983 F. Supp. 1236, 1254 (N.D. Iowa 1997) (citations omitted).

The Court's own instruction on credibility of witnesses facilitates a determination of the witnesses' credibility. The credibility of witnesses instruction states in part:

In deciding what testimony to believe, consider the witness's intelligence, the opportunity the witness had to see or hear the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the witness's drug or alcohol use or addiction, if any, the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you believe.

Preliminary and Final Instructions to the Jury, Preliminary Instruction No. 17, p. 38.

In this specific context, Justice O'Connor, in her concurring opinion in *Phillips*, recognized:

A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case.

*Smith v. Phillips*, 455 U.S. 209, 222, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)

23

(O'Connor, J., concurring).

### 1.    Juror 523

Juror 523's testimony on December 16, 2004, is almost wholly inconsistent and contradictory to her earlier statements to other jurors, Deputy Clerk, Suzanne Carlson, and the Court.  See *supra* sections II.A.1 – II.A.4.  Her testimony was drastically different on December 16, 2004, as compared with her earlier statements to the Court on October 21 and 22, 2004.  Juror 523's December 16, 2004, testimony minimizes the contact with Mr. Bailey.  Despite Juror 523's desire for her testimony on October 21 and 22, 2004, not to be made into a big deal, it is clear by her December 16, 2004, testimony, that the situation was a big deal.  Seven of her coworkers and bosses had been subpoenaed to testify.  She was being brought in to court for the fourth time and in the shadow of her boss.  Juror 523, her coworkers and her bosses all had retained attorneys.  The situation was serious and Juror 523 knew it, along with her supervisors and coworkers.  Juror 523 had every reason to minimize the comments and her reaction to them in an attempt to protect her boss from criminal and/or civil sanctions.  Her original testimony on October 21 and 22, 2004, was contemporaneous and consistent with the testimony of the other members of the jury on October 25, 2004, and is consistent with the testimony of the Deputy Clerk, Suzanne Carlson.

### 2.    CEO, Alden Bailey

24

Alden Bailey is the Chief Executive Officer of the Irving F. Jensen Company, the Brower Construction Company, Castle Rock Construction Company and Jebro Incorporated. (Dec. 16 Tr 19). Mr. Bailey had his own reasons to minimize the comments made to Juror 523.[2] He was likely aware he could face federal juror tampering charges for his conduct. Mr. Bailey testified that he had no knowledge of the case and had not read anything about the case. (Dec. 16 Tr 28-29). Bailey later admitted after further cross-examination that he knew it was a drug case. (Dec. 16 Tr. 29). Mr. Bailey denied making any of the reported comments to Juror 523. When asked if he ever visited with Juror 523 about her responsibilities as a juror, Bailey stated:

> In – after Juror 523 had come back one day – and frankly, I don't know which day it was – and groused a little bit about being picked for jury panel, in a humorous context – and I don't remember the exact words – I said, You should have stood up and said something outrageous and again in a humorous context, That would have been – thrown you off the jury, but that was it.

---

2 In making its credibility findings, the court may properly consider the employer's interest in denying or minimizing his coercive behavior. *In re: Grand Juror Ronnie Webb*, 586 F. Supp. 1480, 1483 (N.D. Ohio 1984) (court "does not accept [employer's] protestations of innocence" to allegations that employer fired employee and made derogatory statements about employee's grand jury service); *Lucas v. Matlack*, 851 F. Supp. 225, 230 (N.D. Va. 1993) (employer's purportedly "joking" comments to employee to "hang the jury" and to try to escape jury duty by claiming prejudice deemed potentially coercive under 28 U.S.C. §1875); *Jeffreys v. My Friend's Place, Inc.*, 719 F. Supp. 639, 642 (M.D. Tenn, 1989) (court refused to credit employer's performance-based explanation for threat to fire employee summoned for federal petit jury service). The court may also place greater weight on the testimony and recollections of court personnel experienced in jury management issues. *Jeffreys*, 719 F. Supp. at 641, 642, 643 (court credits "disinterested" jury clerk testimony concerning statements by juror's employer). Studies of workplace behavior demonstrate not only the coercive nature of both flagrant and subtle supervisor intimidation, but also the willingness of an affected employee, such as Juror 523, to reveal it to outsiders like other jurors and the court clerk. Research also documents an intimidated employee's later minimizing or recanting descriptions of an employer's coercion. *See, e.g.,* Carey, "Fear in the Workplace: the Bullying Boss," *New York Times*, June 22, 2004, F1; Glendenning, "Workplace Bullying: Curing the Cancer of the American Workplace," 30 *Public Personnel Management* 269 (Fall 2001)

Case 3:01-cr-03047-LTS-KEM    Document 634    Filed 03/14/05    Page 25 of 70

(Dec. 16 Tr 20). When asked if he told Juror 523 that she should have stood up and said "hang him," Mr. Bailey stated, "I don't think I would have said hang him." (Dec. 16 Tr 32-33). Bailey thought he may have said to Juror 523, "Possibly say, Well, I'm an expert I the law, enjoy law, he's guilty or something of that nature." (Dec. 16 Tr 33). Mr. Bailey repeatedly asserted that the comment he did make to Juror 523 was made in a humorous context. (Dec. 16 Tr 20, 24, 32). When asked if Juror 523 did anything to indicate that she took it seriously or humorously, Bailey responded, "She should have taken it humorously." (Dec. 16 Tr 20). Bailey admits that this would have been the first time he ever joked with Juror 523 about any of her outside work activities and was actually the first time they had ever talked about outside work activity. (Dec. 16 Tr 31-32). Bailey testified that the only indication he gave that it was a humorous comment was that he was smiling when he said the comment. (Dec. 16 Tr 24). Bailey did not indicate there was any laughter or other indication the comment was made in jest.[3]

---

[3] Both the Congress and the courts have recognized that jury service is at times highly inconvenient to employees and employers, and that preservation of an independent judiciary requires the protection of those called to serve as jurors. Threats and intimidation of jurors because of their jury service by their employers or supervisors has been deemed an obstruction of the administration of justice.

> A jury cannot be expected to listen in the relaxed, attentive manner required to absorb the evidence presented and to discriminate among the evidence, nor to take the time to deliberate and argue in a rational way to reach a unanimous verdict if the members of the jury are worried about the security of their employment positions as a result of threats made by their employers involving jury service.

*In re Adams*, 421 F. Supp. 1027, 1031 (E.D.Mich. 1976) (threat by employee's supervisor to discharge juror if not excused by jury clerk). *See also In re: Grand Juror Ronnie Webb*, 586 F. Supp. 1480, 1483 (N. D. Ohio 1984)

Mr. Bailey denied making any other comments to Juror 523. (Dec. 16 Tr 20-21, 23). Specifically, when asked if he made any comments such as "killer" or "fry him," Bailey responded, "Not that I remember." (Dec. 16 Tr 22). When asked if it was possible that he made comments and does not have any recollection of it, Mr. Bailey stated, "I'm quite sure I did not." (Dec. 16 Tr 22). Bailey testified that he never said to Juror 523, "we need to fry him." (Dec. 16 Tr 36). Bailey denied making any comments in Juror 523's presence or doing anything that would make Juror 523 believe that he was making suggestions to her. (Dec. 16 Tr 22). Bailey's testimony is inconsistent with Juror 523's testimony and the testimony of the other members of the jury.

## D. Obligation to Report Communications to the Court

---

("[Statutory protections] must be strictly enforced, and no employer immune from its strict requirements. Otherwise employees could be threatened, demoted, coerced and intimidated because of jury service, and were this to happen our entire jury system would be in jeopardy.").

In 1978, Congress adopted the Jury System Improvement Act, codified at 28 U.S.C. §1875, to prohibit an employer from discharging, threatening to discharge, intimidating, or coercing any permanent employee by reason of the employee's jury service in any federal court. In enacting these protections, Congress cited not only the motivation for employers to "threaten or harass his employees to encourage their avoidance of such service," but also the inherent difficulty in discovering the coercive behavior from reluctant employees or less-than-candid employers:

> It is now difficult for the courts to respond effectively to such employer tactics, since instances of coercion or threatened dismissal are frequently not brought to the attention of the Court or are posed in such a manner as to evade effective response by the judge.

H.R. Rep. No 95-1652, 95th Congress, 2nd Sess., reprinted in 1978, U.S. Code Cong. & Ad. News 5477, 5480. Federal statutory protection was deemed necessary to "redress[] the present disparity of bargaining position between a harassing employer and his employee who is summoned for jury duty in Federal Court." Id.

Defendant and Counsel are reviewing the matters with an expert in employment law and are contemplating filing an affidavit and/or testimony relevant to this issue. This matter will be submitted, if at all, prior to the Court's ruling on Defendant's Motion for New Trial.

Juror 523 freely discussed her boss' comments with other jurors during the trial and throughout jury deliberations. Juror 523 admitted telling other jurors about the comments her boss had made. Eleven of the fourteen other jurors confirmed this during individual questioning on October 25, 2004. Juror 523 testified that when deciding whether to deliberate on Friday, October 22, 2004, she told the other jurors that her boss made the comment, "guilty, guilty, guilty." (Oct. 22 Tr 4). Juror 523 told at least three or four other jurors about problems with her boss. These jurors recommended that Juror 523 tell the jury clerk, Suzanne, about the problems. (Oct. 22 Tr 7). Later, Juror 523 told a couple of other jurors in the hallway near the bathroom:

> and I had just kinda said, you know, it's really going to be tough going back to work, and a couple others voiced the same thing. And so it was just in that group outside the bathroom in the hallway there…. its just – its just getting tougher and tougher. And two others said the same thing.

(Oct. 22 Tr 7). Additionally, Juror 523 told at least six other jurors about her boss' comments in the van going to or from court:

> I think the first time I said it was in the van going in or going back on one of the times when we got of like at two is when I said it the first time, that its really tough and that most of those guys don't go back to work, and I made the comment that they just don't realize how tough it is to go back, you know, when you have a boss that says things.

(Oct 22 Tr 5-6).

Eleven of the fourteen jurors who were interviewed individually on October 25, 2004, testified they had knowledge of comments made to Juror 523. Only Juror 857

28

and Alternate Jurors 280 and 425 had no knowledge of the comments made to Juror 523. (See Oct 25 Tr 15, 38, 41-42). Jurors 902, 204, 636, 855, 513, 806, 38, 646, 963, 498 and Alternate Juror 914 were aware of the comments. (See Oct 25 Tr 3, 4, 6, 8-9, 10-11, 16, 19, 21, 24, 26, 30, 35). Juror 855 testified that Juror 523 started talking to him about comments made by her boss sometime in September, only a couple of weeks into the merits phase of the trial. (Oct 25 Tr 9). Juror 513 testified that Juror 523 shared with her several comments made by her boss, including remarks "such as fry him and stuff," but could not remember the content of other statements. (Oct 25 Tr 11, 13). Juror 498 testified that Juror 523 told her on October 21, 2004, that her boss would make "negative comments about what he thought the outcome could be, but I don't remember specifics. I mean, I - - I could speculate on what I think she heard - - or what I think I heard, but I think she said like 'hang him' or something like that or 'guilty, guilty, guilty' but . . . ." (Oct 25 Tr 30). Alternate Juror 914 testified that Juror 523 had shared the comments her boss had made to her "a couple of weeks ago," but could not recall the content of the statements when questioned in court. (Oct 25 Tr 35). Juror 914 testified this conversation took place in the hallway downstairs when no other jurors were present. (Oct 25 Tr 35). However, when asked about her conversations with other jurors on December 16, 2004, Juror 523 responded, "I'm not even sure I told the other jurors what Mr. Bailey said." (December 16 Tr 67). The

other jurors were fully aware of the comments made to Juror 523 for a significant period of time before the guilty verdict.

Juror 523 and the other jurors that were made aware of the comments were under an obligation to bring the comments to the Court's attention. Preliminary Instruction No. 21 – Conduct of the Jury, read to the jury on September 8, 2004, states in part:

> Finally to ensure fairness, you as a juror must obey the following rules:
>
> *First,* do not talk among yourselves about this case, or about anyone involved with it, until the end of the case when you go to the jury room to decide on your verdict.
>
> *Second,* do not talk with anyone else about this case, or about anyone involved with it, until the trial has ended and you have been discharged as jurors.
>
> *Third,* when you are outside the courtroom, do not let anyone tell you anything about the case, or about anyone involved with it until the trial has ended and your verdict has been accepted by me. **If someone should try to talk to you about the case during the trial, please report it to me.**

Preliminary and Final Instructions to the Jury, Preliminary Instruction No. 21, p. 43 (emphasis added). Juror 523 failed to notify the Court of any of the comments made to her. Additionally, Juror 523 had spoken with at least eleven other jurors about the comments during the merits phase and penalty phase of the trial. Despite the numerous violations of the Court's jury instructions, none of the other jurors reported the conduct

to the Court. In fact, the comments were only brought to the Court's attention inadvertently after Juror 523 asked for an excuse from work. If it had not been for the alert action of the court personnel, this serious and critical abuse of the judicial process may have never been discovered.

**E.     Interests of Justice Require Granting Motion for New Trial**

Federal Rules of Criminal Procedure Rule 33 states in part, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A district court has broad discretion in its decision to grant a new trial and its ruling is reviewed for abuse of discretion. *United States v. Campos,* 306 F.3d 577, 579 (8th Cir. 2002). While the district court's discretion is quite broad--"it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict,"--there are limits to it. *Id.* (citation omitted). The Eighth Circuit has defined abuse of discretion as, "when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment." *United States v. McNeil,* 90 F.3d 298, 300 (8th Cir. 1996). When considering a motion for new trial, a judge is not required to view the evidence in the light most favorable to the government and can evaluate the evidence

31

and make its own credibility determinations. *United States v. Huerta-Orozco*, 272 F.3d 561, 565-67 (8th Cir. 2001).

In *United States v. Ortiz*, this Court, following its decision to grant defendant a new trial, recognized that a judge is sometimes required to make decisions that are unpopular to safeguard the rights of the criminally accused. *United States v. Ortiz*, 40 F. Supp. 2d 1073, 1086 (N.D. Iowa 1999). The Court stated:

> I cannot meet my judicial obligations by affirming convictions and denying motions for new trial if I am convinced, after a dispassionate and exhaustive review of the evidence on the record, that however faithfully the members of the jury performed their duties, their verdict results in a miscarriage of justice. This is true regardless of the horrific nature of the crime – here the brutal murder of a fifteen year-old boy and the public outrage against the accused.

*Id.* There is substantial evidence in the record that Juror 523 was subjected to intense, persistent pressure from her boss that left her "troubled" and "disturbed" as was the juror in *Remmer*. See *supra* pp. 4-10 (discussing Juror 523's testimony regarding comments made to her by Bailey). The overwhelming evidence in the record indicates that Juror 523 was tampered with by her boss, Alden Bailey. *Id.* The evidence also indicates that both Juror 523 and Alden Bailey minimized the contact after the situation came to the court's attention during their December 16, 2004 testimony. See *supra* pp. 23-27 (discussing the credibility of Juror 523 and Alden Bailey's testimony). It is impossible to have full confidence in a verdict where even one juror has been

32

improperly influenced or disturbed in the untrammeled exercise of their judgment as a juror. In the interests of justice, to ensure that a miscarriage of justice is not done, Mr. Honken's motion for new trial must be granted.

## III. Errors in Pretrial Rulings

### A.    Former Jeopardy

Counts 8 through 12 charge Mr. Honken with the murders of five individuals while, it is alleged, Mr. Honken was engaged in a conspiracy to manufacture and distribute methamphetamine. This is the same conspiracy to which Mr. Honken pleaded guilty in Case No. CR 96-3004 MWB, and for which he is now serving a substantial term of incarceration. The conspiracy is a lesser included offense of each murder charged in Counts 8 through 12. Since Mr. Honken had already been put in jeopardy for a lesser included offense of the offenses charged in Counts 8 through 12, the prosecution of Mr. Honken on those counts violated the double jeopardy clause of the Fifth Amendment to the United States Constitution.

Count 13 through 17 of the superseding indictment charge Mr. Honken with the murder of the same five individuals while engaging in and working in furtherance of a continuing criminal enterprise (CCE). The continuing criminal enterprise alleged in each of Counts 8 through 17 involves the same agreement or understanding to manufacture and distribute methamphetamine as the conspiracy to which Mr. Honken

33

pleaded guilty in Case No. CR 96-3004 MWB. Therefore, the conspiracy to which Mr. Honken pleaded guilty is a lesser included offense of the continuing criminal enterprise charged in each of Counts 13 through 17. That continuing criminal enterprise, in turn, is a necessary element of each of the murders charged in Counts 13 through 17. Therefore, the conspiracy for which Mr. Honken has already been prosecuted is a lesser included offense of each murder charged in Counts 13 through 17, and the prosecution of Mr. Honken on those counts violated the double jeopardy clause of the Fifth Amendment of the United States Constitution.

## 1. The conspiracy in Case No. CR 96-3004 MWB is the same as the conspiracy alleged in Counts 8 through 12.

"It is well settled that the double jeopardy clause of the Fifth Amendment prohibits the subdivision of a single criminal conspiracy into multiple violations." *United States v. Okolie*, 3 F.3d 287, 289 (8th Cir. 1993) (*citing Braverman v. United States*, 317 U.S. 49, 52-53 (1942)). In determining whether a single or separate conspiracy exists, the court looks at the "totality of the circumstances" and:

"considers the following five factors: (1) time; (2) persons acting as co-conspirators; (3) the statutory offenses charged in the indictments; (4) the overt acts charged by the government or any other description of the offenses charged which indicate the nature and scope of activity which the Government sough to punish in each case; and (5) places where the events alleged as part of the conspiracy took place."

*Okolie*, 3 F.3d at 290. Accord, *United States v. Stoddard*, 111 F.3d 1450, 1454 (9th

Cir. 1997).

Comparing the conspiracy allegation in Counts 8 through 12 of the instant indictment with the conspiracy charged in Case No. CR 96-3004 MWB and considering the five factors enumerated in *Okolie*, it is clear that the two conspiracies are one and the same. Counts 8 through 12 of the instant indictment allege a conspiracy to manufacture 100 grams or more of pure methamphetamine and 1,000 grams or more of a mixture or substance containing methamphetamine, and to distribute those quantities of methamphetamine, in the Northern District of Iowa, between 1992 and 1998. The indictment to which Mr. Honken earlier pleaded guilty in Case No. CR 96-3004 MWB charged a conspiracy between "about 1993 and February 7, 1996." However, each of the murders charged in Counts 8 through 12 of the instant indictment is alleged to have occurred in 1993, which is certainly within the same time frame as the conspiracy to which Mr. Honken pleaded guilty. Moreover, the same individuals are alleged to have been involved in both conspiracies. Both the conspiracy alleged in Counts 8 through 12 of the instant indictment and the conspiracy to which Mr. Honken pleaded guilty are alleged to have violated Title 21, United States Code, Sections 846 and 841. Although neither Count 1 of the 1996 indictment nor Counts 8 through 12 of the instant indictment describe any overt acts in furtherance of the alleged conspiracy, it is clear that Mr. Honken was punished in Case No. CR 96-

35

3004 MWB based upon a finding that he had obstructed justice by causing "the disappearance of one or more persons, including prospective prosecution witness in 1993" who are, in fact, the same persons he has alleged to have killed in Counts 9 through 12. *U.S. v. Honken*, 184 F.3d at 964-5. Of course, the vast bulk of the events described in both indictments are alleged to have occurred in the Northern District of Iowa. Therefore, under the totality of the circumstances test, it cannot be disputed that the two conspiracies are the same.

Moreover, the government's position at trial was that the two conspiracies were one and the same, despite its earlier contention that the conspiracies were separate. Therefore, the Court's pretrial ruling that the conspiracies were separate was in error, and must be reversed.

### 2. The conspiracy to manufacture and distribute methamphetamine is an essential element of each of the murders charged in Counts 8 through 12.

This proposition is obvious, incontestable, and needs little discussion. "To be convicted of killing while engaged in a drug conspiracy, one must kill while engaged in 'an offense punishable under § 841(b)(l)(A).' 21 U.S.C. § 848 (a)(I)(A)." *United States v. Jones*, 101 F.3d 1263, 1268. Since the conspiracy itself is an essential element of each murder charge, the conspiracy is a lesser included offense of the murder charge. The drug conspiracy is analogous to the underlying felony in a charge

36

of felony murder. See *Whalen v. United States*, 445 U.S. 684 (1980). "A conviction for killing in the course of a rape cannot be hand without proving all the elements of the events of a rape." *Id*. at 693-94. In other words, for double jeopardy purposes, the drug conspiracy and murder while engaged in the drug conspiracy are the same offense, since every fact necessary to prove the conspiracy must also be proved to convict of the murder. See *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *Brown v. Ohio*, 432 U.S. 161 (1977).

Since, as demonstrated above, the drug conspiracy of which Mr. Honken has already been convicted is the same drug conspiracy which is a lesser included offense of each murder charged in Counts 8 through 12, the double jeopardy clause prohibits Mr. Honken's prosecution on those counts. "Whatever the sequence may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense." *Brown v. Ohio*, 432 U.S. at 169.

**3.** **The drug conspiracy charged in Case No. CR 96-3004 MWB is a lesser included offense of the continuing criminal enterprise charged in Counts 13 through17 of the instant indictment.**

Where the "agreement" at the core of a drug conspiracy is the same "agreement" which is at the core of a continuing criminal enterprise, the conspiracy is a lesser included offense of engaging in the continuing criminal enterprise. *Jeffers v. United*

37

*States*, 432 U.S. 137 (1977) (plurality).[4] As the Eighth Circuit has put it, "In *Jeffers v. United States*, 432 U.S. 137, 97 S. Ct. 2207, 53 L. Ed. 2d 168 (1977), the Supreme Court decided that a conspiracy was a lesser included offense of continuing criminal enterprise and that a defendant may not, therefore, stand convicted of both offenses because 'the convictions punished twice for the same conduct.'" *United States v. Jelinek*, 57 F.3d 655, 660 (1995) (*citing United States v. Holt*, 969 F.2d 685, 687 (8th Cir. 1992)). Accord, e.g. *United States v. Fairchild*, 189 F.3d 769, 781 (8th Cir. 1999); *United States v. Jefferson*, 215 F.3d 820, 823 (8th Cir. 2000).[5]

Although Counts 8 through 12 of the indictment do not specify the overt acts in furtherance of the conspiracy they allege, Counts 13 through 17 set forth in great detail the series of narcotics violations alleged to have been involved in the continuing criminal enterprise. A comparison of those violations with the indictment in Case No. CR 96-3004 MWB makes it clear that the agreement at the core of the drug conspiracy to which Mr. Honken pleaded guilty in Case No. CR 96-3004 MWB is the same agreement which forms the core of the charged continuing criminal enterprise in

---

4 Eight justices agreed with this proposition. The plurality held that Jeffers "was solely responsible for the successive prosecutions for the conspiracy offense and the continuing criminal enterprise offense . . ." and that "his action deprived him of any right that he might have had against consecutive trials." 432 U.S. at 154. The four dissenting in part disputed the holding that Jeffers had somehow waived his right to complain of the double jeopardy violation. *Id.* at 158-159.

5 *Jelinek, Fairchild* and *Jefferson*, among other Eighth Circuit cases, permit a single trial on both the conspiracy and continuing criminal enterprise charges. If the conviction on the greater continuing criminal enterprise charge is affirmed, the conviction on the lesser drug conspiracy charge is vacated. Obviously, this procedure has no application in the instant case, where the double jeopardy claim involves successive prosecutions for a lesser included and greater inclusive offense.

38

Counts 13 through 17 of the instant indictment - an agreement to manufacture and distribute methamphetamine in the Northern District of Iowa. Applying the totality of the circumstances test put forth in *Okolie*, 3 F.3d at 290, it is clear that the time frame of the charged continuing criminal enterprise encompasses the entire time frame of the drug conspiracy to which Mr. Honken pleaded guilty.[6] The persons with whom Mr. Honken is alleged to have undertaken the continued criminal enterprise in concert are all individuals who were involved in the drug conspiracy to which Mr. Honken pleaded guilty in Case No. CR 96-3004 MWB. As discussed above, if the agreement is the same, the statutory offense of drug conspiracy is a lesser included offense of the statutory offense of continuing criminal enterprise. Moreover, the overwhelming majority of acts alleged to have been involved in the commission of the continuing criminal enterprise are alleged to have occurred in the Northern District of Iowa, as were the overt acts in the conspiracy to which Mr. Honken pleaded guilty. There is no question that the drug conspiracy to which Mr. Honken pleaded guilty in Case No. CR 96-3004 MWB is a lesser included offense of the continuing criminal enterprise which is alleged in Counts 13 through 17 of the instant indictment.

---

6 Although the continuing criminal enterprise is alleged to have occurred between about 1992 and 2000, and the drug conspiracy is alleged to have occurred between 1993 and February 7, 1996, there are no predicate offenses involving Mr. Honken alleged to have occurred after February 7, 1996. The only two offenses alleged to have occurred after that date involve actions attributed to Angela Johnson on or about March 25, 1998 and April 17, 1998. It is certainly no coincidence that the last predicate act involving Mr. Honken alleged in the instant indictment is alleged to have occurred on the last date charged for the conspiracy in the 1996 indictment - the day drug manufacturing equipment and chemicals were allegedly found at Mr. Honken's residence in Mason City.

**4.    The existence of a continuing criminal enterprise is an essential element of the murders charged in Counts 13 through 17 of the instant indictment.**

This Court, in a companion case, has recognized this principle. "However, it is readily apparent that at a minimum, the elements for proof of *the existence* of a continuing criminal enterprise, as stated in [*United States v.*] *Maull* [806 F.2d 1340 (8th Cir. 1986), *cert. denied* 80 U.S. 907 (1987)], and that Johnson was 'working in furtherance of' that continuing criminal enterprise are necessary elements of the 'murder in furtherance of a continuing criminal enterprise' charges against Johnson . . ." *United States v. Johnson*, 225 F. Supp. 2d 109, 1020 (N.D. Iowa, 2002) (emphasis in original) (discussing the necessity to sufficiently specify in the indictment the continuing criminal enterprise at issue).

Since the drug conspiracy to which Mr. Honken pleaded guilty in Case No. CR 96-3004 MWB is a lesser included offense of the continuing criminal enterprise charged in Counts 8 through 17 of the instant indictment, and since that continuing criminal enterprise is an essential element of the murders charged in those counts, it necessarily follows that the drug conspiracy is a lesser included offense of those murders. See *Whalen v. United States, supra.*

**5.    The double jeopardy clause precludes the successive prosecution of Mr. Honken for the murders charged in Counts 13 through 17 of the instant indictment.**

Since, in Case No. CR 96-3004 MWB, Mr. Honken had already been convicted of an offense which, as shown above, is a lesser included offense of the continuing criminal enterprise murders charged in Counts 13 through 17 of the indictment, the double jeopardy clause of the Fifth Amendment prohibits Mr. Honken's successive prosecution on those counts. *Brown v. Ohio, supra.* In *United States v. Cole,* 293 F.3d 153 (4th Cir. 2002), the Fourth Circuit dealt with the similar claim. Cole, charged in the Eastern District of Virginia with continuing criminal enterprise and committing murder while engaged in drug trafficking, asserted that the prosecution was barred by his prior drug conspiracy prosecution in the Southern District of Florida. *Id.* at 156-157. In analyzing this claim, the Fourth Circuit noted:

> The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. One component of this constitutional guarantee prohibits successive prosecutions for the 'same offense'. *Brown v. Ohio,* 432 U.S. 161, 165 . . . [additional citations omitted]. The Clause thus 'provid[es] criminal defendants with a measure of finality and repose," insuring that one who has endured "the ordeal of criminal prosecution through to judgment" will not be retried "for the same alleged misconduct. [*United States v.*] *Ragins,* 840 F. 2d [1184] at 1188. At the same time, however, there is no constitutional immunity from prosecution for distinct criminal activity.

*Id.* at 158.

Apparently agreeing that if Cole's Florida conviction was for the same offense as the Virginia prosecution, double jeopardy would bar the later, the Fourth Circuit

Case 3:01-cr-03047-LTS-KEM   Document 634   Filed 03/14/05   Page 41 of 70

analyzed the facts of that case under the same totality of the circumstances test discussed above. *Id.* at 158-161. Concluding that "the Florida conspiracy and the instant conspiracy are not remotely the 'same offense' in the eyes of the double jeopardy clause," *id.* at 160, and that "the same agreement did *not* form the basis for the Florida conspiracy charge and the instant continuing criminal enterprise conviction," *id.* at 161 (emphasis in original), the Fourth Circuit denied the double jeopardy claim. However, it is clear that under the facts of the instant case, the logic of *Cole* dictates a different result. Since the drug conspiracy to which Mr. Honken pleaded guilty in Case No. CR 96-3004 MWB is unquestionably the same offense and involves the same agreement as the continuing criminal enterprise alleged in Counts 13 through 17 of the instant indictment, this subsequent prosecution for those counts does, in fact, place Mr. Honken twice in jeopardy for the same offense.

Mr. Honken acknowledges that convictions for continuing criminal enterprise murder and for engaging in the continuing criminal enterprise in a single prosecution have been affirmed by the Eighth Circuit. See, e.g., *United States v. Jones*, 101 F.3d 1263 (8th Cir. 1996); *United States v. Moore*, 149 F.3d 773 (8th Cir. 1998.) However, none of those cases involved the successive prosecution aspect of the double jeopardy clause. Clearly, the successive prosecution aspect of the double jeopardy prohibition is far stronger than the double jeopardy protection against multiple punishments for the

same offense. "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). However, "The Double Jeopardy Clause is cast explicitly in terms of being 'twice put in jeopardy.' [The Supreme Court has] consistently interpreted it 'to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.'" *Id.* at 365. Therefore, cases which affirm convictions for both continuing criminal enterprise murder and engaging in a continuing criminal enterprise have no relevance to a successive prosecution context like the instant case.[7]

The guilty verdicts and sentences returned on Counts 8 through 12 and Counts 13 through 17 violate double jeopardy and must be vacated.

## B. Failure to Disclose Grounds for Disqualification

### 1. Standards for Disclosure and Judicial Disqualification

28 U.S.C. §455(a) requires that a judge "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." As the United States Court of Appeals for the 8th Circuit has made clear, §455 was amended by Congress to broaden the grounds for judicial qualification and imposes on a judge an obligation to disqualify himself "if a reasonable person who knew the circumstances would question

---

7 Moreover, so far as Mr. Honken can determine, no double jeopardy claim was raised in those cases.

the judge's impartiality, even though no actual bias or prejudice has been shown."
*United States v. Tucker*, 78 F.3d 1313, 1324 (8th Cir.), *cert. denied* 519 U.S. 820, 117
S. Ct. 76, 136 L. Ed. 2d 35 (1996); *Fletcher v. Conoco*, 323 F.3d 661, 664 (8th Cir.
2003). "Whether a judge actually has a bias, or actually knows of grounds requiring
recusal is irrelevant -- §455(a) sets an objective standard that does not require scienter.
We have recast the issue as 'whether the judge's impartiality might reasonably be
questioned by the average person on the street who knows all the relevant facts of the
case.'" *Moran v. Clarke*, 296 F.3d 638,648 (8th Cir. 2002) (citations omitted.)

Intended to "promote public confidence in the integrity of the judicial process,"
*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859-560, 100 L. Ed. 2d
855, 108 S. Ct. 2194 (1988), the statute also anticipates that litigants may waive
grounds for disqualification but only if such a waiver is "preceded by a full disclosure
on the record of the basis for disqualification." 28 U.S.C. §455(e). The plain
language, legislative history, and case law compel strict compliance with the disclosure
and waiver requirements. *Barksdale v. Emerick*, 853 F.2d 1359, 136-1362 (6th Cir.
1988).

Threats to the personal safety of the presiding judge, especially those arising
from an "extrajudicial source," and believed to involve the defendant whose case the
court is about to consider, constitute grounds for disqualification under §455(a) where

44

the perceived threat was not made only in an attempt to obtain a different judge. In *United States v. Greenspan*, 26 F.3d 1001 (10th Cir. 1994), the court of appeals held that §455(a) required that a trial judge recuse himself after learning from the FBI allegations that the defendant he was about to sentence was involved in a conspiracy to kill the trial judge or members of the judge's family. In the absence of evidence that the threat was a ruse by the defendant to obtain a different judge, the statute compelled recusal.

> The bottom line here is that this judge learned of an apparently genuine death threat made against him and against his family under circumstances that made it quite unlikely that the threat was intended as a device to obtain a recusal. The judge obviously took the threat very seriously, and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it. Under such circumstances, it is obvious to us that a reasonable person could question the judge's impartiality. Even if this judge were one of those remarkable individuals who could ignore the personal implications of such a threat, the public reasonably could doubt his ability to do so.

> Recusal under section 455 is to be judged on the record. It is not a question of either the government or the defendant bearing a burden of proof. Rather, recusal is an action taken by the judge, and the judge must document the reasons for his or her decision so that the decision may be reviewed, if necessary, by an appellate court. Here, the record convinces us that the judge's impartiality might reasonably be questioned, and thus his recusal is mandated by 28 U.S.C. §455(a).

26 F.3d at 1007.

Similarly, a United States district court judge scheduled to preside over post-conviction motions recused himself from further consideration of those matters after

45

law enforcement officers informed the court that the defendant had placed a contract with certain hit men to have the judge killed. In response to the threat, the judge was put under around-the-clock protection and security by the United States Marshals Service, protection in effect from the time the threat was learned until the court's ruling on the recusal issue. Finding 18 U.S.C. §455(a) "self-activating," and considering how "its participation would look to the person in the street," the court concluded that a reasonable person would necessarily harbor doubts as to the judge's impartiality. The district judge disqualified itself from all further matters. *United States v. Cerrella*, 529 F. Supp. 1373, 1380-81 (S.D. Fla. 1982).

Likewise, in a decision recently announced by the United States Court of Appeals for the Seventh Circuit, the court held that a defendant's threat to destroy the site of the federal courts in Chicago warranted recusal of the presiding judge, notwithstanding the judge's contention that there never had been "any real danger" of damage to the building and that she had no "actual fear of harm" that might influence her rulings. *In re Gale Nettles*, 394 F.3d 1001, 1002 (7th Cir. 2005). Even though the threat to the courthouse was nil – Nettles alleged accomplices were undercover federal agents – the *appearance* of prejudice was deemed significant enough under 28 U.S.C. §455(a) to compel recusal.

### 2. The Trial Court's Duty to Disclose

Case 3:01-cr-03047-LTS-KEM   Document 634   Filed 03/14/05   Page 46 of 70

As revealed by defense counsel's professional statement on December 16, 2004, the Defendant became aware for the first time after trial that security measures had been implemented to furnish protection to the trial judge and, at times, the trial judge's family. It was also counsel's recollection that the court was asked during the hearing on courtroom security in July, 2004, whether the court entertained *other* security concerns that might have affected the court's decision.[8] The record now reveals that as early as mid-July, 2004, the United States Marshals Service had instituted efforts to implement security procedures for the court and that by the start of and during the course of trial, those procedures were implemented. It is also undisputed that these security measures were taken based on "the level of threat that may have been posed or perceived to be ... posed by this case." [Transcript of Dec. 16, 2004, hearing, p. 84]. Neither the fact of nor the nature of these security measures had been disclosed to the Defendant. [Transcript of Dec. 16, 2004, hearing, p. 80]. The record also establishes

---

8 In granting the prosecution's motion to have the Defendant wear shackles at trial, the court relied on evidence presented at Mr. Honken's sentencing hearing on his 1996 indictment and proceedings on the government's motion for an anonymous jury. [Memorandum Opinion and Order, July 21, 2004, p. 25]. The court found that evidence from those proceedings showed that the Defendant had "intimidated and used violence against witnesses, attempted to escape from the Woodbury County Jail, and attempted to enlist the aid of associates inside and outside of the Jail for both purposes." [Memorandum Opinion and Order, July 21, 2004, p. 25]. The court also indicated that it placed reliance on Marshal Archiga's opinions that "additional security measures are required in this case, because Honken poses a danger to trial participants and a threat of escape." [Memorandum Opinion and Order, July 21, 2004, p. 26]. Although the court concluded that Mr. Honken had attempted to escape and "is likely to attempt to escape from custody with the intention not only of escape but of engaging in violence against witnesses, law enforcement officers, prosecutors, and possibly other trial participants," [Memorandum Opinion and Order, July 21, 2004, p. 36], it also found that "there is no record of *courtroom* disruption by Honken." [Memorandum Opinion and Order, July 21, 2004, p. 39]. Finally, although the court found that Mr. Honken "has or has allegedly" attempted to escape and commit violence against or intimidate witnesses, law enforcement officers, and prosecutors [Memorandum Opinion and Order, July 21, 2004, p. 40], the court gave no indication that it was aware of any evidence that Mr. Honken had ever expressed any antipathy toward the court or any intention to harm the court or his

47

that both the preliminary plans and final implementation of the security measures were revealed to the court. [Transcript of Dec. 16, 2004, hearing, pp. 82-83].

Aside from the evidence considered by the court in its evaluation of the government's motions for an anonymous jury and to physically restrain the Defendant during trial, the Defendant does not know whether any *additional* information was conveyed to the trial court by the Marshals Service or anyone else about threats to the safety of the court or his family, nor is the Defendant aware of the court's response to any safety concerns or other security measures implemented by the Marshals Service. The Defendant contends that the court's approval of or acquiescence in these personal measures – based as they were on the threat "posed or perceived" in this case – was the very type of matter the court should have disclosed to the parties as required by §455(a). At the very least, the Defendant should have been informed about the basis for the court's concerns about safety, given an opportunity to address those concerns, and weigh them in determining whether to seek recusal. Without that perspective, the Defendant and his counsel were ill-equipped to consider adequately not only the advisability of seeking recusal, but also the potential impact of the court's concerns about *personal* safety on the issues of courtroom security and jury anonymity.

While these undisclosed security measures affected the Defendant's meaningful

family.

48

exercise of important trial rights and his access to the effective assistance of counsel, it is irrelevant under the statute [9] what the Defendant's position on recusal or other issues *might* have been. The true test under §455(a) remains whether a reasonable person would have questioned the court's impartiality knowing what the Defendant did *not* know and could not now waive or ratify. Even if, as in <u>Nettles</u>, this court considered the danger to himself and his family as "nil," the potential "person-on-the-street" perception is far different. The court erred in not disclosing concerns for his personal and family safety, and that security measures would be instituted in response. Because public confidence in the integrity of the proceedings has been wounded, a new trial is mandated.

## C. Error in Ordering Defendant be Shackled

In granting the government's motion that Mr. Honken be shackled during the trial, the court concluded that evidence presented at Honken's sentencing hearings in 1997 and 1998, as well as Marshal Roger Archiga's opinions on the need for courtroom security, justified the use of leg shackles and an electronic stun belt to prevent the Defendant from endangering trial participants or attempting to escape.

---

9 The courts have recognized that §455(a) establishes a statutory disqualification standard more demanding than that required by the due process clause. Although the Supreme Court observed in <u>Liljeberg</u> that the statute's intent in promoting public confidence in the integrity of the judicial process had "constitutional dimensions," n. 12, 486 U.S. at 865, 108 S.Ct. at 2202, 100 L.Ed. 2d at 875, one court has concluded that "the Due Process Clause requires a judge to step aside when a reasonable judge would find it necessary to do so. Section 455 requires disqualification when others would have reasonable cause to question the judge's impartiality." <u>United States v. Couch</u>, 896 F.2d 78, 82 (5th Cir. 1990). *See also* <u>United States v. Sypolt</u>, 346 F.3d 838, 840 (8th Cir. 2003) ('In contrast to the due process clause, the recusal statute is concerned largely with insuring that the federal judiciary

49

[Memorandum Opinion and Order Regarding the Government's Motion to Have the Defendant Wear Shackles at Trial, pp. 25-26, 36, 37, 40, 49-50]. Specifically, the court found that Honken had attempted to escape from the Woodbury County Jail, had intimidated and used violence against witnesses, and had attempted to enlist the aid of others inside and outside the jail for both purposes. [*Id.*, pp. 25, 36, 37, 40]. The court acknowledged that there was no evidence of any disruptive courtroom conduct by Honken, nor of any dangerous or disrespectful conduct toward deputy marshals engaged in transporting the Defendant. [*Id.*, p. 39].

The Defendant contends that the evidentiary record considered by the court was insufficient to warrant the extreme security measures ordered. In particular, the evidence failed to support a conclusion that Honken constituted a *present* threat to the safety of any trial participants or a credible escape risk. In the absence of any record of belligerent, threatening or disruptive courtroom conduct, the stale, speculative and unreliable evidence of Honken's activities at the Woodbury County Jail in the late 1990s failed to justify measures deemed inherently prejudicial by the courts. *See, e.g., Gilmore v. Armentrout*, 861 F.2d 1061, 1071 (8th Cir. 1988). Although the Defendant cannot establish that any members of the jury observed the leg shackles or stun belt used in the courtroom, he contends that use of manacles and law enforcement escorts on imprisoned witnesses would have led jurors to conclude that he, too, was physically

appears to be impartial, in addition to actually being impartial.")

restrained at counsel table. Despite the extensive precautionary steps ordered by the court to minimize actual prejudice to the Defendant, Honken's trial rights, including his right to be afforded the dignity and usual accommodations of one accused of a crime, were adversely affected. *Zygaldo v. Wainright*, 720 F.2d 1221, 1223 (11th Cir. 1983), *cert. denied* 466 U.S. 941, 104 S. Ct. 1921, 80 L. Ed. 2d 468 (1984). The court abused its discretion in imposing the courtroom security measures employed in this case.

## D.    Erroneous Empanelling of Anonymous Jury

For the reasons cited in his resistance to the government's motion for anonymous jury, the Defendant contends that the court abused its discretion in ordering the empanelling of an anonymous jury, and that he was deprived of his statutory and constitutional rights to a list of the prospective jurors, the presumption of innocence, trial by an impartial jury, and to effective voir dire.

While the court correctly cited the factors to be applied in determining the necessity for an anonymous jury [Memorandum Opinion and Order Regarding Government's Motion for Anonymous Jury, pp.34-46], it erred in concluding that the preponderance of *evidence* established that disclosure of juror identity information to the parties "may jeopardize the life or safety of any person," 18 U.S.C. §3432, or that there was "strong evidence to believe the jury need[ed] protection. *United States v.*

51

*Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995), *cert. denied* 517 U.S. 1149, 116 S. Ct. 1449, 134 L. Ed. 2d 569 (1996). In contrast with the factual circumstances reflected in the authority cited by the court in support of its ruling, here the record failed to establish that Mr. Honken was affiliated with any confederates who remained at large during trial, or that the *nature* of the criminal enterprise to which Honken belonged involved or could be involved in harming *jurors*. *Compare, e.g., Darden* at 1532-33 ("The enterprise had many members and associates who remained at large throughout the trial."). At most, the evidentiary record revealed a past effort to harm or intimidate witnesses but was completely devoid of any danger to the safety of *jurors*. The court itself recognized that there was no evidence that Honken had engaged in any disruptive courtroom behavior. *See* Memorandum Opinion and Order Regarding the Government's Motion to Have the Defendant Wear Shackles at Trial, p. 39. The court placed undue weight on the past allegations against the Defendant in its attempt to discern a *present* capacity to harm jurors. Notwithstanding the court's "neutral" explanation of anonymity to the prospective jurors, the Defendant contends the risk of "de-individualization" described in the study authored by the Defendant's jury consultant was not overcome, and his rights to an impartial jury thereby damaged.

For all the reasons cited in his resistance and at the hearing on the government's motion, the Defendant contends that the court abused its discretion in empanelling an

52

anonymous jury.

## IV. Errors in Jury Selection

### A. Defense Challenges Erroneously Denied

The Court erred in denying defense challenges for cause to Jurors Number 140, 642, 99, 849, 170, 552, 365, 711, 902 and 556. Considering the voir dire examination (including the jury questionnaires) of each of these prospective jurors as a whole, each of them indicated that he or she would always choose to impose a death sentence if permitted to do so under the law[10] and the instructions of the Court, and thus were disqualified from sitting on this case under the rule of *Morgan v. Illinois*, 504 U.S. 719 (1992). Mr. Honken was prejudiced by the erroneous denial of these challenges, since he was compelled to use peremptory strikes to remove Jurors Number 140, 642, 99, 849, 170, 552, 365, 711 as trial jurors and to remove Juror Number 556 as an alternate juror (who would have been seated as a deliberating juror), and since Juror Number 902 sat on the jury which convicted Mr. Honken and sentenced him to death. The erroneous denial of these challenges denied Mr. Honken his constitutional rights to a fair trial, to a fair and impartial jury, to due process, and to be free from the arbitrary and capricious imposition of the death penalty, and thus violated the Fifth, Sixth and Eighth Amendments to the United States Constitution.

---

[10] Although federal law does not require that a defendant utilize peremptory challenges to cure erroneous denials of challenges for cause, *cf. Ross v. Oklahoma*, 487 U.S. 81 (1988), the fact that Mr. Honken used all

## B.    Prosecution Challenges Erroneously Granted

The Court erroneously sustained the prosecution's challenge for cause to Jurors Number 538 and 813, both of whom were qualified to serve under the principles of the line of cases exemplified by *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 810 (1985). The erroneous exclusion of a juror qualified under those cases is error and mandates a new trial, because it affects the composition of the jury panel as a whole. *Gray v. Mississippi*, 481 U.S. 648, 665 (1987). Although each of these jurors exhibited scruples about the death penalty, a fair consideration of their entire voir dire examinations (including juror questionnaires) lead inescapably to the conclusion that neither juror's scruples would substantially impair their ability to follow the Court's instructions with regard to determining punishment. *See Gray*, 481 U.S. at 653.

Juror Number 538's qualifications were the subject of briefing by the parties, and Mr. Honken incorporates by reference his previous briefing on her qualifications. Juror Number 813 was subjected to scathing questioning by the Court concerning matters totally unrelated to the case at bar - her opinion regarding the O.J. Simpson case - but never indicated an inability to follow the law in the case at bar.   The erroneous granting of these challenges denied Mr. Honken his constitutional rights to a

---

available peremptory challenges and was still compelled to leave an unqualified juror (Juror 902) on the jury demonstrates the extent Mr. Honken was prejudiced by the Court's erroneous denials of his challenges for cause.

54

fair trial, to a fair and impartial jury, to due process, and to be free from the arbitrary and capricious imposition of the death penalty, and thus violated the Fifth, Sixth and Eighth Amendments to the United States Constitution.

## V.    Errors During Trial

### A.    Confrontation Clause Violations and the Erroneous Admission of Hearsay

The Court erroneously admitted several lines of testimony and items of documentary evidence over Mr. Honken's objections that they were hearsay and violated his right to confront and cross-examine witnesses against him. Some of this evidence (statements attributed to Greg Nicholson by Lezlie Olson, a tape-recording of Nicholson's conversation with Mr. Honken, and statements attributed to Terry DeGeus by Aaron Ryerson and JoAnn DeGeus) was admitted under the "forfeiture by wrongdoing" theory embodied in Fed. R. Evid. 804(b)(6). Other of this evidence, including statements attributed to Angela Johnson by a variety of sources, writings and diagrams attributed to Ms. Johnson, and the statements made by an unknown woman who telephoned Rick Held and identified herself as "Dustin's girlfriend", was admitted as "co-conspirator statements" under Fed. R. Evid. 801(d)(2)(E). Some of this evidence, notably the testimony of Mizell about what was asked of Angela Johnson when she appeared before the grand jury, was admitted with no basis discernible to Mr.

Honken.

With regard to the "forfeiture by wrongdoing" rulings, Mr. Honken argues that the evidence was hearsay and its admission violated Mr. Honken's right to confront the witnesses against him, and for the reasons set forth in Mr. Honken's pretrial Resistance to the admission of such evidence, which is incorporated by reference. Although this evidence was admitted under the "forfeiture by misconduct" theory, that theory of admissibility stems from legislative enactments of the twentieth century, and cannot obviate the Confrontation Clause prohibition against the admission of testimonial statements made out of court with no opportunity for cross examination. "[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations against the accused." *Crawford v. Washington*, 124 S. Ct. 1354, 1363 (2004). The Supreme Court went on to observe that, "*ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them." *Id.* at 1364. Certainly the "forfeiture by wrongdoing" rule is such a modern rule, and its application to the evidence complained of herein violates Mr. Honken's right to confront the witnesses against him.

With regard to the "co-conspirator statements, Mr. Honken also urges that the provisions of Fed. R. Evid. 801(d)(2)(E) cannot obviate the Confrontation Clause

56

prohibition against the admission of testimonial statements made out of court with no opportunity for cross examination. "[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations against the accused." *Crawford v. Washington*, 124 S. Ct. 1354, 1363 (2004). The Supreme Court went on to observe that, "*ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them." *Id.* at 1364.

Moreover, there was insufficient foundation to bring much of this evidence within the ambit of Fed. R. Evid. 801(d)(2)(E). For example, a letter with Ms. Johnson's home as the return address had an illegible signature, and there was no sufficient showing that it was authored by her in the course and furtherance of any conspiracy. The maps she drew for Mr. McNeese and the notations she put on them were certainly created long after any conspiracy involving Mr. Honken was ended, and were clearly in furtherance of what Johnson believed was her conspiracy with McNeese.

Most strikingly lacking in foundation under Fed. R. Evid. 801(d)(2)(E) is the telephone call to Mr. Held from "Dustin's girlfriend." Rick Held testified that Mr. Honken asked him to purchase a small handgun for a girlfriend who was moving to Des Moines. According to Mr. Held, some two or three weeks after Mr. Honken's

arrest, Held received a telephone call from an unknown woman who identified herself as "Dustin's girlfriend." The woman told Mr. Held that "Dustin does not need that pup any more," which Held interpreted as a reference to the handgun. Mr. Honken objected on the basis of hearsay and his right to confront witnesses against him. That objection was erroneously overruled after the government asserted that the conversation was not offered to show the truth of the matter asserted, but to show that Mr. Honken was exerting control over the gun. After a recess, the Court, again erroneously, alternatively found by a preponderance of the evidence that the caller was Angela Johnson (despite testimony that Mr. Honken had another girlfriend, Kathy Rick, and that Mr. Honken had an intimate romantic relationship with Tim Cutkomp's former wife) and that the telephone conversation was within the "coconspirator statements" rule.

Assuming, as Mr. Held did, that the conversation made reference to the handgun, the assertion that "Dustin doesn't need that pup any more" is tantamount to the assertion that Dustin is exerting control of the handgun, so the out of court statement was clearly offered for the truth of the matter asserted. Obviously, the assertion by the unknown woman that she was "Dustin's girlfriend" is rank hearsay (to which Mr. Honken objected), but it is absolutely essential to the Court's erroneous finding that the caller was Angela Johnson. Absent such a finding, the issue of

58

coconspirator statements does not even arise with regard to the telephone call. As Fed. R. Evid. 801(d)(2) provides, "the contents of the statement shall be considered but are *not alone sufficient to establish*...the existence of the conspiracy *and the participation therein of the declarant* and the party against whom the statement is offered..." (Emphasis added). There is nothing whatsoever except the claimed statement of the anonymous female to establish any sort of relationship, let alone a co-conspiratorial relationship, of that declarant with Mr. Honken.

With regard to the testimony of Agent Mizell about questions asked Ms. Johnson when she appeared before the grand jury, Mizell was asked about whether, during her grand jury testimony on October 27, 1993, Angela Johnson was asked about the drug connection between Mr. Honken and Terry DeGeus. Mr. Honken objected that this was hearsay, and the government responded that it was not offered to show the truth of the matter asserted, but rather to show that the question was asked. The Court erred in overruling Mr. Honken's objection because the fact that this question was asked was the very matter asserted by Agent Mizell, who obviously was not present during Ms. Johnson's grand jury testimony and was testifying as to what someone else had told him or as to what he had read. This entire line of questioning denied Mr. Honken his right to confront the witnesses against him under *Crawford, supra*. Moreover, had Mr. Honken had an opportunity to confront and cross-examine the

59

source of Agent Mizell's information, he could have elicited information about Ms. Johnson's behavior and demeanor when she was asked this question, to cast doubt on the prosecution version of events.

## B.   Restricting the Cross-Examination of Tim Cutkomp

The Court sustained the government's Motion in Limine, and at trial precluded Mr. Honken from cross-examining Mr. Cutkomp concerning the repeated incidents of indecent exposure Cutkomp had related to Mr. Honken. Mr. Honken reasserts and incorporates by reference the arguments set forth in his pretrial Resistance to the government's Motion in Limine. At trial, Mr. Cutkomp testified extensively about conversations he had with Mr. Honken, and tape recordings of some of those conversations were played to the jury. Later, the transcript of Mr. Honken's sentencing hearing in Case No. CR 96-3004 MWB was introduced in evidence. As Mr. Honken explained at his sentencing hearing, he became extremely concerned about Mr. Cutkomp's mental health as a result of Cutkomp telling him that he was "cracking up" and exposing himself. The nature of Mr. Cutkomp's misconduct was directly related to the extent of Mr. Honken's concern for Cutkomp's mental health, and to the lengths to which Mr. Honken went to reassure Cutkomp in the tape recorded conversation. By permitting Mr. Cutkomp to testify concerning the conversations and permitting the jury to listen to the recordings, but precluding Mr. Honken from

60

establishing through Cutkomp the reason Honken said the things he said on the recordings, the Court prevented Mr. Honken from adequately and effectively confronting the evidence against him, in violation of the Sixth Amendment to the United States Constitution.

## C. Overruling Motion for Mistrial when Scott Gahn Persisted in Testifying about Alleged Cocaine Use by Mr. Honken Despite the Court Having Earlier Sustained Mr. Honken's Objection to this Testimony.

During redirect examination, Scott Gahn claimed that Mr. Honken had made Gahn nervous on two occasions, and attempted to "blurt out" that Mr. Honken was using cocaine on those occasions. Mr. Honken's objection was sustained by the Court. In purported response to the very next question, Gahn again asserted that Mr. Honken had used cocaine on those occasions. The damaging and irreparable impact of prosecution misuse of evidence designed to appeal to the passions and prejudices of the jury is thoroughly discussed (and condemned) in *Miller v. Pate*, 386 U.S. 1 (1967). The Court erred in denying Mr. Honken's motion for a mistrial based on the deliberate misconduct of this prosecution witness which placed extremely damaging evidence of uncharged crimes before the jury in defiance of the Court's rulings.

## D. Errors in Penalty Phase Instructions

### 1. 21 U.S.C. § 848 (n)(1) Factors

The Court erred, to Mr. Honken's prejudice, by instructing the jury to weigh as

61

aggravating the mental factors set forth in 21 U.S.C. § 848 (n)(1). Those factors merely replicate the minimum culpable mental states required for death eligibility under the Eighth Amendment to the United States Constitution. *See Enmund v. Florida*, 458 U.S. 782 (1982), *Tison v. Arizona*, 481 U.S. 135 (1987). Absent a finding of one of the factors codified at 21 U.S.C. § 848 (n)(1), no one can be considered eligible for a death sentence in the United States. Therefore, telling the jury to weigh such factors as aggravating in determining the sentence to impose placed an impermissible thumb on the death side of the scale and led to the arbitrary and capricious imposition of death sentences on Mr. Honken, in violation of the Eighth Amendment to the United States Constitution.

## 2. Non-statutory Aggravating Factor No. 2

The Court erred in submitting, over Mr. Honken's objection, the government's non-statutory aggravating factor No. 2, obstruction of justice by eliminating witnesses, because that "aggravating factor" merely reiterated the jury's merits phase findings regarding Counts 1 through 5. At the time of these offenses, the murder of a federal witness to prevent cooperation or testimony was not a capital offense. Congress had made the decision that such conduct did not warrant imposition of the death penalty. Therefore, to use such conduct as a "non-statutory aggravating factor" and a reason to impose the death penalty was contrary to congressional intent. *See United States v.*

62

*Peoples*, 74 F.Supp.2d 930 (W.D. Mo. 1999)(Congressional intent did not permit submitting prior convictions which did not qualify as statutory aggravating factors as a non-statutory aggravating factor).

## VI. Insufficiency of the Evidence

Mr. Honken respectfully submits that the evidence adduced by the Government is insufficient to sustain a conviction for any offense charged in the Indictment. The testimony of the Government witnesses was contradictory, preposterous and at odds with natural law and human experience. By discussing more specifically certain Counts charged in the indictment, Mr. Honken does not intend to waive any objection to the insufficiency of the evidence to support a conviction as to any other Count.

## A. Conspiracy Murder

Counts 8 through 12 of the Indictment charge Mr. Honken with the murder of five people while engaging in a drug trafficking conspiracy. Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan are alleged to have been killed on or about July 25, 1993. Terry DeGeus is alleged to have been killed on or about November 5, 1993. However, the Government's evidence makes it clear that any drug conspiracy in which Mr. Honken may have been involved ended shortly after the arrest of Gregory Nicholson, Mr. Honken and others in March, 1993. That conspiracy was over, for all intents and purposes, long before July 25, 1993.

The objectives of the alleged drug conspiracy are alleged to have been the distribution and manufacture of methamphetamine and of a methamphetamine mixture. There is absolutely no evidence whatsoever that Mr. Honken (or any of the alleged co-conspirators) was in any way involved with methamphetamine after Mr. Honken's arrest in March, 1993, until Mr. Honken attempted to manufacture methamphetamine in 1995 and 1996. This "new" or "second" conspiracy was not a continuation of the earlier conspiracy, but involved a new agreement among different people, although it also included Mr. Honken and Mr. Cutcomp, who allegedly been involved in the earlier conspiracy.

Since the alleged conspiracy which ended in March, 1993 involved a different agreement than the later conspiracy to make and distribute methamphetamine in 1995 and 1996, there are two separate conspiracies. "We held in *Braverman v. United States,* 317 U.S. 49, 53, 63 S. Ct. 99, 101, 87 L. Ed. 23 (1942), that '[t]he gist of the crime of conspiracy as defined by the statute is the agreement ... to commit one or more unlawful acts,' from which it follows that 'the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects.' A single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Broce,* 488 U.S. 563, 570-571

(1989).

Mr. Honken acknowledges that, usually, "It is a question of fact for the jury whether the government has shown a single conspiracy or multiple conspiracies." *United States v. Slaughter*, 128 F.3d 623, 629 (8th Cir. 1997)(citing *United States v. Morales*, 113 F.3d 116, 118-19 (8th Cir.1997)). However, there must be evidence from which the jury can conclude that there is a single conspiracy. In this case, that evidence is totally lacking. Government witness Jeff Honken testified that the methamphetamine manufacturing operation was ended in 1992 or 1993. Government witness Dan Cobeen testified that he was in on the ground floor of a conspiracy to manufacture and distribute methamphetamine beginning in 1995. Government witness Tim Cutkomp testified that he left the drug conspiracy in February or March, 1993, that he left because he wanted to get out of the methamphetamine business, move back to Iowa and get a job. At that time, he had no plans for future involvement with methamphetamine. Cutkomp testified that in 1995 or 1996 he, Mr. Honken and Dan Cobeen set up a laboratory to manufacture methamphetamine in Mason City. Cutkomp also testified that before the Cobeen venture, he and Mr. Honken attempted unsuccessfully to make methcanthinone and MDA, possibly in 1995. Of course, that does not show the existence of a unitary conspiracy to manufacture methamphetamine continued throughout 1993 and 1994.

Since there is no evidence from which a reasonable jury could have found beyond a reasonable doubt that Mr. Honken was engaging in the charged unitary drug conspiracy on or about July 25, 1993 or on or about November 5, 1993, this Court must enter judgments of acquittal on Counts 8 through 12.

## B. CCE Murder

Counts 13 through 17 charge Mr. Honken with murder while engaging in or working in furtherance of a continuing criminal enterprise (CCE). Mr. Honken incorporates by reference and reasserts the arguments regarding conspiracy murder set forth above. Even if Mr. Honken had been a member of a CCE before his arrest in March, 1993, that CCE had ended well before July 25, 1993.

The government has not presented evidence from which a reasonable jury could have found beyond a reasonable doubt that Mr. Honken was a member of a CCE, whether engaging in it or acting in furtherance of it. Since the government submitted these counts under the theory that Mr. Honken was engaging in the CCE rather than acting in furtherance of it, Mr. Honken need not address the latter theory. The essence of a CCE offense is the requirement that there be five or more persons supervised by the individual engaging in the CCE. "To be convicted of a CCE offense, a defendant must have acted in concert with five or more persons over whom he held a position of

66

organizer, supervisor, or manager." *United States v. Maull*, 806 F.2d 1340, 1343 (8th Cir. 1986)

To prove that Mr. Honken was engaging in a CCE, the government must present evidence to prove beyond a reasonable doubt that he acted as an "organizer, supervisor or manager of five other persons. *United States v. Maull, supra*. The government contends that Mr. Honken supervised his brother, Jeff Honken, Tim Cutkomp, Gregory Nicholson, Terry DeGeus and Angela Johnson. It is clear that DeGeus and Johnson were only customers, not members of the CCE. (Nicholson allegedly stored methamphetamine for Mr. Honken, and, therefore, was arguably a member of the CCE). However, it is even more clear that Dustin Honken in no way, shape or form organized, supervised or managed Jeff Honken. Jeff Honken admitted as much on cross-examination. According to Jeff's testimony, Dustin lived in Jeff's house, depended on Jeff for food, transportation and pocket money. Jeff rented the apartment where Dustin and Tim Cutkomp first started making meth. Jeff rented the house in the country where Dustin and Cutkomp made meth, and Jeff showed up occasionally to bring groceries. It is clear that Jeff supervised Dustin, not the other way around. Of the six individuals identified by the Government as involved in the CCE, none can be said to have organized, supervised or managed the others. Jeff Honken had no contact whatsoever with Nicholson, DeGeus or Johnson, and did not even know they existed

as individuals, rather than as some nameless customers in Iowa. Tim Cutkomp does not claim to have organized, managed or supervised anyone. There is no evidence that anyone organized, managed or supervised Jeff Honken; certainly not Nicholson, DeGeus or Johnson. The evidence is that Nicholson and DeGeus did not even know each other; in his recorded conversation with Mr. Honken, Nicholson talks about, "that Terry guy" and asks Mr. Honken what Terry's last name is.

Since the Government has not presented evidence from which a reasonable jury could have found beyond a reasonable doubt that Mr. Honken was either engaging in a CCE on or about July 25, 1993 or November 5, 1993, the Court must enter judgments of acquittal on Counts 13 through 17.

PARRISH KRUIDENIER MOSS DUNN
BOLES GRIBBLE & COOK, L.L.P.

BY: _Alfred Parrish_
Alfredo Parrish     Bar#PK0004191
2910 Grand Avenue
Des Moines, Iowa 50312
(515) 284-5737
Fax (515) 284-1704
Aparrish@parrishlaw.com
ATTORNEY FOR DEFENDANT

BY: _Leon Spies (AP)_
Leon Spies

68

MELLON & SPIES
Iowa State Bank Building
Suite 411
Iowa City, Iowa 52240
(319) 337-4193
Fax (319) 337-2396
CO-COUNSEL FOR DEFENDANT

BY: *Charles Rogers (AP)*

Charles Rogers
1101 Walnut, Suite 103
Kansas City, Missouri 64106
(816) 221-0080
Fax (816) 221-3280
CO-COUNSEL FOR DEFENDANT

### PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause by:

( )    personal service      (X)    first class mail
( )    certified mail, return receipt requested    ( )    facsimile
( )    Airborne Express (overnight)
on the 14th day of March , 2005.
I declare that the statements above are true to the best of my information, knowledge and belief.

*Julie Buchanmas*

Honorable Mark Bennett
Federal Courthouse
320 Sixth Street
Sioux City, Iowa 51101

Mr. Charles J. Williams
Assistant United States Attorney
P.O. Box 74950
Cedar Rapids, Iowa 52407-4950
(319) 363-0091
(319) 363-1990 Fax

69

ATTORNEY FOR UNITED STATES

Mr. Thomas Miller
Attorney General of Iowa
Hoover State Office Building
Des Moines, Iowa 50319

Leon Spies
MELLON & SPIES
Iowa State Bank Building
Suite 411
Iowa City, Iowa 52240
(319) 337-4193
Fax (319) 337-2396
CO-COUNSEL FOR DEFENDANT

Charles Rogers
1101 Walnut, Suite 1300
Kansas City, Missouri 64106
(816) 221-0080
Fax (816) 221-3280
CO-COUNSEL FOR DEFENDANT

Mr. Dustin Honken #06951-029
United States Penitentiary
PO Box 2000
Marion Illinois 62959
DEFENDANT